# IN THE CIRCUIT COURT FOR WASHINGTON COUNTY, MARYLAND

GERALD FALKE and MARLENE
FALKE, 12821 Oak Hill Avenue,
Hagerstown, Maryland 21742, Individually
and on behalf of all others similarly
situated,

                    Plaintiffs,

      vs.

LIFELOCK, INC., a Delaware
Corporation; RICHARD TODD DAVIS, a
citizen of the State of Arizona, 60 East Rio
Salado Parkway, Tempe, Arizona 85281,
and JOHN DOES 1 through 10, Inclusive,

                    Defendants.

Case No.: 21-C-08-30505 CN

## CLASS ACTION COMPLAINT

The Plaintiffs, Gerald Falke and Marlene Falke, individually, and on behalf of all others similarly situated, by and through undersigned local counsel, Spencer M. Hecht, and the law firm of Hecht & Associates, hereby sue the Defendants, LifeLock, Inc., Richard Todd Davis, and John Does 1 through 10 (collectively "the Defendants"). In support thereof, the Plaintiffs allege as follows:

### I. NATURE OF CASE

1.      This is a class action lawsuit brought by, and on behalf of, Maryland subscribers of LifeLock, Inc., a company which holds itself out as "the industry leader in the rapidly growing field of Identity Theft Protection."

1

FILED

08 APR 17 AM 11: 20

CLERK ...........

BY:_____

2.     This matter arises from the deceptive business practices and fraudulent advertising campaign implemented by LifeLock, Inc. ("LifeLock"), its agents, employees, servants and representatives, through which it has induced nearly one million individuals, including the Plaintiffs and the Putative Class, into subscribing to the identity theft protection services the company purportedly provides.

3.     To induce consumers across the country to subscribe to its services, LifeLock claims in its advertisements that it will prevent any possibility of identity theft, in any form.

4.     In LifeLock's ubiquitous marketing campaign, the company's Chief Operating Officer ("CEO"), Todd Davis, cavalierly broadcasts his own social security number – 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 – on television and radio stations across the country, proclaiming his unwavering confidence in LifeLock's purported protections.

5.     In reality, however, LifeLock simply does not provide the level of identity protection that it advertises in its deceptive marketing campaign.

6.     Contrary to the all-encompassing identity protection LifeLock advertises, its protection only extends to limited, credit-related instances of identity theft.

7.     Even in those limited credit-related instances, LifeLock does not necessarily protect its subscribers' identities as advertised.

8.     Indeed, the representations made by LifeLock's CEO are false and misleading because his own identity was stolen while he was a LifeLock customer.

9.     While LifeLock has only publically acknowledged that Davis's identity was compromised on one (1) occasion, the fact is that there are more than twenty (20) driver's licenses that have been fraudulently obtained through the misappropriation of Davis's personal information.

2

10.    Furthermore, a simple background check performed using Davis's social security number reveals that his entire personal profile has been compromised to the extent that the birth date associated with his social security number is November 2, 1940, which would make Davis 67 years old. This is clearly fraudulent information. .

11.    In addition to its inability to provide the level of protection it advertises, LifeLock fails to disclose and intentionally omits from its advertisements the potential harms that its services may have on consumers.

12.    As described in further detail below, LifeLock's services can actually have an adverse impact on the consumer's ability to obtain credit or favorable interest rates.

13.    In addition to the foregoing, in its advertisements, LifeLock fails to advise or make clear to consumers that they could perform each of LifeLock's services on their own, free of charge.

14.    Instead, in the few advertisements in which LifeLock does allude to this fact, LifeLock preys on consumer fears and misleads potential subscribers into believing that the services it provides embody a complicated, time-consuming process that require LifeLock's "expertise" and assistance.

15.    LifeLock also fails to adequately disclose and intentionally omits from its advertisements the information that the credit reports it orders on behalf of the subscribers is the free annual credit report which subscribers are entitled to receive when placing their own fraud alerts, pursuant to 15 U.S.C. §1681c-(a)(2)(B).

16.    As a result, when LifeLock orders the free annual report, it renders the subscribers ineligible to order their free report for the next twelve months. This fact is not disclosed to subscribers.

17.     LifeLock also fails to adequately disclose and intentionally omits from its advertisements the true nature and scope of its One Million Dollar ($1,000,000.00) service guarantee, which is essentially futile given the numerous restrictions, limitations, and waivers that are present within its terms.

18.     Finally, LifeLock fails to disclose that the methods it employs in providing its purported protection are improper and violate the Fair Credit Reporting Act, 15 U.S.C. §1681, *et seq.*

19.     Upon information and belief, as a result of its fraudulent campaign, LifeLock has generated nearly one million subscribers, each of whom pay approximately One Hundred and Ten Dollars ($110.00) per year for its "services."

20.     Thus, by virtue of LifeLock's deceptive scheme, its subscribers have each suffered an ascertainable loss in the form of the subscription fees they pay for services that: (a) do not provide the level of identity protection advertised, and (b) may actually impair their ability to obtain credit or financing, and (c) a service guarantee that is, at best, illusory.

21.     Plaintiffs Gerald and Marlene Falke ("the Falkes") are husband and wife who reside in Hagerstown, Maryland.

22.     In or about March of 2008, the Falkes decided to subscribe to LifeLock after viewing one of the company's popular television commercials.

23.     In the television commercial, a truck prominently displaying CEO Todd Davis's social security number is driven through crowded city streets.

24.     The commercial left the Falkes with the impression that LifeLock would provide them with comprehensive identity protection.

25.     The Falkes' decision to subscribe to LifeLock was also heavily based on the company's purported One Million Dollar ($1,000,000.00) service guarantee, which, they were

lead to believe, would reimburse them for any financial damage sustained by a subscriber as a result of identity theft.

## II. JURISDICTION AND VENUE

26.    This Honorable Court has personal jurisdiction over the Defendants to this action pursuant to §6-103 of the Courts and Judicial Proceedings Article of the Maryland Annotated Code as the Defendants regularly conduct business in the State of Maryland.

27.    This Honorable Court has subject matter jurisdiction over this matter pursuant to §4-402 of the Courts and Judicial Proceedings Article of the Maryland Annotated Code as the Complaint demands equitable relief, a declaratory judgment, and damages in excess of Thirty Thousand Dollars ($30,000.00), exclusive of interest, costs, and attorney's fees.

28.    This venue is appropriate pursuant to §6-201 of the Courts and Judicial Proceedings Article of the Maryland Annotated Code as the Defendants carry on a regular business in Washington County, Maryland, and the Plaintiffs reside in Washington County, Maryland.

## III. PARTIES

29.    Plaintiff Dr. Gerald Falke ("Dr. Falke") was at all times relevant hereto, a resident of, and consumer, in the State of Maryland. In or about March 2008, Dr. Falke began subscribing to LifeLock. Dr. Falke is a proper party plaintiff to this action because he has suffered losses as a result of LifeLock's unlawful conduct alleged herein.

30.    Plaintiff Marlene Falke ("Mrs. Falke") was at all times relevant, a resident of, and consumer, in the State of Maryland. In or about March 2008, Mrs. Falke enrolled as a LifeLock subscriber. Mrs. Falke is a proper party plaintiff to this action because she has suffered losses as a result of LifeLock's unlawful conduct alleged herein.

31.    Defendant LifeLock is a Delaware corporation with its principal place of business at 60 E. Rio Salado Parkway, Tempe, Arizona 85281. Defendant LifeLock maintains its principal place of business in Arizona and transacts substantial business within that state.

32.    Defendant Richard Todd Davis ("Davis") is a resident of Chandler, Arizona. Davis is, upon information and belief, the Chief Executive Officer of LifeLock.

33.    The true names and capacities, whether individual, corporate, associate or otherwise, of the Defendants named as JOHN DOES 1 through 10, inclusive, are unknown to Plaintiffs and the Putative Class who, therefore, sue those Defendants by such fictitious names. Plaintiffs and the Putative Class are informed and believe and thereon allege that each of the Defendants sued herein as JOHN DOES 1 through 10 are and were the agents and/or employees of each and every other Defendant and were at all relevant times acting within the course and scope of such agency and employment, and/or are legally responsible in some manner for the events and happenings herein referred to and caused injuries and damages proximately thereby to Plaintiffs and the Putative Class as alleged herein. Plaintiffs will seek to amend this Complaint to allege the true names and capacities of such Defendants when ascertained.

## IV. GENERAL ALLEGATIONS

### THE HISTORY OF LIFELOCK

34.    In or about 2005, Defendant Todd Davis and his colleague Robert J. Maynard, Jr. founded LifeLock.

35.    According to the company's website, LifeLock is the "industry leader" in "proactive identity theft protection, specializing in prevention of identity theft rather than the reporting of it" (http://www.lifelock.com/lifelock-for-people/who-we-are/who-is-lifelock, as of March 28, 2008).

36. LifeLock further claims that its identity theft protection system was purportedly developed as a result of "more than three years" of "solid research" and building "relationships with the right organizations." (http://www.lifelock.com/lifelock-for-people/who-we-are/who-is-lifelock, as of April 11, 2008).

37. Since its inception, LifeLock's purported "goal" has been "to lock down every individual's private information so no one except that individual can approve its use." (http://www.lifelock.com/lifelock-for-people/who-we-are/who-is-lifelock, as of April 11, 2008).

## LIFELOCK'S NEFARIOUS ORIGIN

38. Throughout its countless hours of advertising, LifeLock never discloses any of the less propitious information about its founding or its founding member, Robert Maynard.

39. Upon information and belief, Maynard developed the idea for LifeLock while sitting in a jail cell after having been arrested for failure to repay a $16,000.00 casino marker taken out at the Mirage Hotel in Las Vegas.

40. Additionally, Maynard, who previously acted as LifeLock's Chief Marketing Officer, had been subject to an injunction, pursuant to which the FTC has banned him for life from "advertising, promoting, offering for sale, selling, performing, or distributing any product or service relating to credit improvement services."

41. (The aforementioned injunction) resulted from Maynard's production of misleading infomercials regarding the services provided by his credit improvement company, National Credit Foundation.

42. Upon information and belief, these harsh sanctions were also meant to penalize Maynard for engaging in a scheme through which he arranged unauthorized withdrawals from customer accounts at National Credit Foundation.

7

43. Finally, and perhaps most disturbing, is that upon information and belief, Maynard himself has engaged in the very type of identity theft that his company purportedly sets out to eliminate, by stealing his own father's identity.

44. Specifically, upon information and belief, Maynard misappropriated his father's identity to obtain an American Express card. Maynard then ran up over One Hundred Thousand Dollars ($100,000.00) in debt on the charge card. Eventually, American Express sued Maynard's father in an effort to recover the balance.

## THE SERVICES LIFELOCK PROVIDES

45. According to the company's official website, a general LifeLock subscription provides four (4) services that are designed to protect its subscriber from identity theft.

46. First, LifeLock "ask[s] the credit bureaus to set free fraud alerts on [the subscriber's] behalf.

47. Second, LifeLock renews those fraud alerts "every 90 days or so."

48. Third, LifeLock requests that subscribers' names be removed from pre-approved credit card and junk mail lists.

49. Fourth, every year, LifeLock orders free credit reports, on behalf of its subscribers, from the major credit bureaus.

## LIFELOCK MISREPRESENTS THE
## SCOPE OF ITS SERVICES

50. LifeLock deceptively markets its services through (i) its website located at www.lifelock.com; (ii) affiliated web pages; (iii) press releases; (iv) news publications; (v) television commercials; and (vi) radio advertisements.

51. LifeLock knows yet fails to disclose that the services it provides do not offer the breadth of protection that it promotes through its massive advertising campaign.

8

52.    The primary service that LifeLock provides to protect against identity theft is the placement and renewal of fraud alerts on subscribers' credit profiles.

53.    The representations made in LifeLock's advertisements regarding the scope and effectiveness of fraud alerts are misleading and fail to disclose material facts regarding the limitations inherent in the service.

54.    Through its advertisements, LifeLock misrepresents and assures consumers that it can protect against all types of fraud including, without limitation, computer hacking, password theft, and other non-credit related theft. These representations are false.

55.    In actuality, the fraud alerts LifeLock places only work to combat credit-related identity theft, which is merely one form of theft amongst many others, which include bank related identity theft, employment related identity theft, medical related identity theft, and government documents or benefits identity theft.

56.    There is no conspicuous mention of this fact, nor any disclaimer in the plethora of information about the limitations of LifeLock's services on the company website or in LifeLock's advertisements.

57.    In contrast, LifeLock's advertisements create the illusion that LifeLock provides complete and comprehensive identity protection, by employing misrepresentations that include, but are not limited to, the following:

(a)    "Here's a report I have on John Sheiper, a young hacker – sent out a virus, put more than 250,000 computers to work stealing passwords to bank accounts from people around the world." (LifeLock radio advertisement);

(b)    "LifeLock's own CEO is so positive our service secures identities that he has broadcasted his social security number on our homepage, in our commercials, and

in our media spots because he wants to prove that we can protect anyone's identity from scammers, thieves, and hackers.";

(http://lifelockprotection.wordpress.com/2007/11/10/lifelock-protect-your-good-name, as of April 11, 2008);

(c) "This very second, someone could be using your identity to... clear out your bank accounts...Stop it from happening now. Call LifeLock..." (LifeLock radio advertisement);

(d) "LifeLock, the industry leader in proactive identity theft protection, offers a proven solution that prevents your identity from being stolen before it happens." (http://www.lifelock.com/default.aspx?promocode=Shareasale&SSAID=252168, as of April 11, 2008); and

(e) "Which would you rather have, a lock on your door keeping the thieves out, or an alarm telling you after the thief has ripped you off." (www.lifelock.com/lifelock-for-people/how-we-do-it/how-is-lifelock-different-from-a-credit-monitoring-system, dated March 26, 2008.).

## LIFELOCK MISREPRESENTS THE EFFECTIVENESS OF ITS SERVICES

58.    Through its deceptive advertisements and marketing tools, LifeLock misrepresents the effectiveness of the services it provides.

59.    LifeLock knows yet fails to disclose that the services it provides do not offer the level of protection that is promoted through their massive advertising campaign.

60.    Specifically, LifeLock misrepresents that its subscribers will receive a telephone call when his or her personal information is used to apply for new credit.

61.    LifeLock fails to advise subscribers that companies and institutions that issue credit *are not required by law* to contact them, even if they have fraud alerts in place.

10

62.    LifeLock's misrepresentations regarding the effectiveness of its services include, but are not limited to, the following:

(a)    "Once fraud alerts have been placed, you will receive a phone call — most people register their cell phone numbers — *anytime* someone tries to open a credit line in your name." (*emphasis added*) (Statement by Todd Davis, CEO of LifeLock, Inc., in article titled "Fraud alerts can protect ID", www.azstarnet.com/business/202488, as of April 11, 2008);

(b)    "If it's you trying to open the account, then you'll get the call *while you're standing there.*" (*emphasis added*) (Statement by Todd Davis, CEO of LifeLock, Inc., in article titled "Fraud alerts can protect ID," www.azstarnet.com/business/202488, as of April 11, 2008);

(c)    "The alert *ensures* you will receive a phone call whenever someone –even you– tries to establish using your identifying information..." (*emphasis added*) (www.mylifelock.org, as of April 11, 2008);

(d)    "When someone seeks to open a new account, the creditor will call to confirm that it's really you through a series of identifying questions." (Statement by Todd Davis, CEO of LifeLock, Inc., in article titled "Protecting identity among the tell-all generation," www.startribune.com/templates/Print This Story?sid=1191451, as of April 11, 2008.);

(e)    "If someone is trying to use your personal information, you will be contacted by the creditor that is issuing the line of credit. If you receive a call and you are not the one applying for credit, the transaction should be stopped immediately." (http://www.lifelock.com/lifelock-for-people/what-to-expect/who-calls-me-to-let-

11

04-22-'08 16:22 FROM-Marks & Klein LLP 732-219-0625 T-962 P015/029 F-066
Case 1:08-cv-01351-RDB Document 2 Filed 05/23/08 Page 12 of 26

me-know-that-someone-is-attempting-to-obtain-credit-in-my-name, as of April 11, 2008.);

(f) "You will know whenever anyone tries to use your credit before damage is done" (http://www.idtheftquiz.org, as of April 11, 2008.);

(g) "The most important difference between LifeLock and other fraud protection services is our proactive approach to identity theft. LifeLock is not a credit monitoring service that alerts you when we find a problem, we actually stop crime *before it happens by having the credit bureaus alert you* when someone tries to make changes in your status or inquire about your credit." (*emphasis added*) (http://lifelockprotection.wordpress.com/2007/11/10/lifelock-protect-your-good-name/, as of April 11, 2008); and

(h) "We start by putting fraud alerts on your information with all three of the major credit card bureaus and ChexSystems, allowing only you to be able to apply for credit lines or make changes to your accounts. This is the most important step in our service because it prevents thieves from being able to use your identity, since the fraud alert *requires creditors to contact you* by the phone number listed on LifeLock's report before verifying any changes, such as extending limits or changing billing addresses." (*emphasis added*) (http://lifelockprotection.wordpress.com/2007/11/01/comparing-lifelock/, as of April 11, 2008).

## LIFELOCK CONCEALS AND OMITS THE POTENTIAL HARMS THAT ITS SERVICES COULD HAVE ON SUBSCRIBERS' CREDIT PROFILES

63. Through its deceptive advertisements and marketing tools, LifeLock conceals and omits the adverse effects that its services could have on its subscribers' credit profiles.

12

64.    LifeLock knows yet fails to disclose that the services it provides can have an adverse impact on a subscriber's credit profile.

65.    For instance, LifeLock's advertisements omit and conceal the fact that its placement and continuous renewal of fraud alerts could prohibit its subscribers from obtaining credit.

66.    Additionally, LifeLock's advertisements omit and conceal the fact that its placement and continuous renewal of fraud alerts could have an adverse impact on its subscribers' ability to obtain a home loan or refinance their existing loans

67.    LifeLock's advertisements also omit and conceal the fact that each time a fraud alert intercepts an attempt to obtain credit, an inquiry is created on the subscriber's credit profile which can adversely affect the subscriber's credit score.

## LIFELOCK OMITS OR CONCEALS THE TRUE ORIGIN OF THE CREDIT REPORT IT ORDERS FOR ITS SUBSCRIBERS

68.    LifeLock represents to consumers that its services include a credit report from each of the three credit bureaus every 12 months.

69.    However, through its deceptive advertisements and marketing tools, LifeLock omits and conceals that the credit reports it orders on behalf of its subscribers are the free annual credit report to which subscribers are already entitled to receive without being a LifeLock subscriber.

70.    LifeLock also omits and conceals that by its ordering of the credit report, the subscribers are now rendered ineligible to order the free report on their own for the next 12 months.

71.    LifeLock further omits and conceals that ordering the free credit report from www.annualcreditreport.com is duplicative of the free credit report consumers are entitled to when placing a fraud alert under the Fair Credit Reporting Act, 15 U.S.C. § 1681c-1(a)(2)(B).

## LIFELOCK'S TERMS AND CONDITIONS ARE SUBSTANTIVELY AND PROCEDURALLY UNCONSCIONABLE

72. The services LifeLock provides to its subscribers are governed by LifeLock's "Terms and Conditions."

73. LifeLock's "Terms and Conditions" are presented to consumers on a take-it-or-leave-it basis, in a standardized printed form, and therefore is a contract of adhesion.

74. None of LifeLock's subscribers, including the Plaintiffs and the Putative Class, had any bargaining power with which to negotiate the "Terms and Conditions."

75. Additionally, the LifeLock "Terms and Conditions" include an arbitration clause that purports to prohibit class-action arbitration.

76. This provision is meant to deter and eliminate any possibility for a consumer to seek redress for any grievances for the deceptive conduct perpetrated by LifeLock.

77. While LifeLock purports to pay all of the costs of a subscriber's arbitration, this representation is false and misleading, as it fails to take into account the significant ancillary costs incurred as a result of the subscriber being required to arbitrate his or her individual claims in the State of Arizona.

78. Such costs include, but are not limited to, the travel to and lodging in Arizona for both the subscriber and his or her attorney.

79. Such costs exponentially exceed the amount of financial damage sustained by an individual LifeLock subscriber, as a result of LifeLock's deceptive conduct.

80. Accordingly, the arbitration provision does not allow LifeLock subscribers, including the Plaintiffs and the Putative Class, to adequately vindicate their rights.

81. Such a provision is so one-sided that it shocks the conscience, and is therefore unconscionable and unenforceable.

## LIFELOCK MISREPRENTS THE SCOPE AND NATURE
## OF ITS $1,000,000 SERVICE GUARANTEE

82.     LifeLock deceives consumers further by touting its "one-million dollar service guarantee."

83.     This service falsely and deceptively purports to insulate subscribers in the event LifeLock's services are ineffective.

84.     LifeLock's advertisements deceptively misrepresent the scope of its purported one-million dollar service guarantee, drastically overstating the actual value of its protections, which are essentially rendered useless by virtue of the restrictions, limitations and waivers contained within its terms.

85.     Examples of LifeLock's misrepresentations regarding its million dollar service guarantee include, without limitation, the following:

(a)     "With our million dollar guarantee, you have absolutely *nothing to lose* by signing up with us" (http://lifelockprotection.wordpress.com/2007/10/22/the-lifelock-guarantee/, as of April 11, 2008) (*emphasis added*);

(b)     "If your Identity [sic] is misused while you are a member of LifeLock, we'll spend up to $1,000,000 to make it right." (http://www.lifelock.com/lifelock-for-people.aspx, as of April 11, 2008); and

(c)     "LifeLock will pay you up to $1 million for damages stemming from the security breach. LifeLock says they will "make sure that you get every dollar back, lost wages, costs, actual losses, every dollar up to $1,000,000. Period." (http://www.lifelocklife.com/million-dollar-guarantee.html, as of April 11, 2008).

86.     Contrary to the representations made in LifeLock's misleading advertisements, the terms and conditions of the actual guarantee reveal protections that are significantly limited in comparison to those advertised.

15

87.    Specifically, the express terms of the Service Guarantee, at section "2" paragraph "G", disclaim as follows

> WE WILL PAY UP TO $1,000,000 TO CURE THE FAILURE OR DEFECT IN OUR SERVICE, PER CLIENT, PER LIFETIME FOR ALL INCIDENTS IN THE AGGREGATE, REGARDLESS OF CIRCUMSTANCE...WE WILL NOT MAKE PAYMENTS TO YOU FOR ANY LOSS YOU MAY INCUR. OTHER THAN OUR SERVICE GUARANTEE, AND EXCEPT AS OTHERWISE SET OUT HEREIN WE MAKE NO REPRESENTATION OR WARRANTY ABOUT OUR SERVICE OF ANY KIND, AND WE DISCLAIM ANY IMPLIED WARRANTIES OUTSIDE OF OUR SERVICE GUARANTEE, SUCH AS A WARRANTY OF MERCHANTABILITY OR FITNESS OF OUR SERVICE FOR ANY PARTICULAR PURPOSE.

88.    In actuality, the narrow terms of LifeLock's service guarantee disclaim all consequential damages and all liability for anything beyond a defect in their service.

89.    Accordingly, the service guarantee is only enforceable when LifeLock fails to properly place a fraud alert or properly request to remove the subscriber from a pre-approved credit card or junk mail list.

90.    This language is intended to mislead and deter members from asking LifeLock to cover losses or pay for consequential damages such as hiring professionals to restore their losses, and to provide LifeLock with a basis for denying any such claims.

91.    For example, assume LifeLock properly places a fraud alert on a subscriber's credit profile. Now assume that a lender issues a credit card to an identity thief because that lender never called the subscriber. In that case LifeLock would avoid having to make good on its service guarantee since it properly administered its services. This is deceptive.

92.    In further contrast with the misrepresentations in its advertisements, in the event that the Service Guarantee is triggered, LifeLock is not required to "spend up to $1,000,000.00 to make it right," or "cover all losses and all expenses up to one million dollars" under the Terms & Conditions. (http://www.lifelock.com/lifelock-for-people.aspx, as of April 11 2008).

16

93. Rather, LifeLock would only be required to: (a) reimburse direct expenses the subscriber incurred up to One Million Dollars ($1,000,000.00), and (b) assist and advise damaged subscribers by paying third-party professionals up to One Million Dollars ($1,000,000.00) to resolve the subscribers' damages, including, without limitation, damages to their credit profiles and credit ratings.

94. Upon information and belief, LifeLock will not use the advertised One Million Dollars ($1,000,000.00) to actually recoup any of the subscribers' financial losses, as the advertisements would lead consumers to believe.

## V. CLASS ACTION ALLEGATIONS

95. Pursuant to Maryland Rule 2-231 the plaintiffs bring this action on behalf of themselves and the Class of similarly situated persons defined as:

> All residents of the state of Maryland (including persons and business entities) that subscribed to LifeLock during the longest period permitted by the applicable statutes of limitations. Excluded from the Class are the officers, directors and employees of Defendants and their respective legal representatives, heirs, successors and assigns.

96. **Numerosity**: Members of the Class are so numerous that their individual joinder is impractical. The precise identities, number, and addresses of members of the Class are unknown to Plaintiffs, but may and should be known with proper and full discovery of Defendants, third-parties, and their respective records. All Class members pray for money damages, temporary and permanent injunctive relief, and declaratory relief because the parties opposing the Class have acted on grounds generally applicable to the Class, thereby making appropriate injunctive relief to the class as a whole.

97. **Existence of Common Questions of Fact and Law**: There is a well-defined commonality and community of interest in the questions of fact and law affecting the members of the Class. The common questions of fact and law include, among other things:

17

(a)    Whether and to what extent defendants' practices, conduct, and misrepresentations violate Maryland law;

(b)    Whether Plaintiffs and the Putative Class members are "consumers," as defined under Md. Commercial Law Code Ann. § 13-101(c)(1) and (2);

(c)    Whether LifeLock's radio, television, internet and print advertisements are "advertisements" as defined under Md. Commercial Law Code Ann. § 13-101(b)(1) and (2);

(d)    Whether LifeLock is a "merchant" as defined under Md. Commercial Law Code Ann. § 13-101(g);

(e)    Whether LifeLock's advertisements include false or misleading oral or written statements, visual descriptions, or other representations of any kind which have the capacity, tendency, or effect of deceiving or misleading consumers;

(f)    Whether LifeLock's conduct, as complained of herein, constitutes "unfair and deceptive trade practices" as defined under Md. Commercial Law Code Ann. § 13-301;

(g)    Whether LifeLock's advertisements include representations, regarding its services, of a use, benefit, or quantity which its services do not have;

(h)    Whether LifeLock advertises that its services are of a particular standard, quality, grade, style, or model which they are not;

(i)    Whether LifeLock's advertisements fail to state a material fact, and that such failure deceives or tends to deceive consumers;

(j)    Whether LifeLock advertises or offers consumer services without intent to sell, those services as advertised or offered;

(k)  Whether LifeLock's advertisements employ deception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that consumers rely on the same in connection with the sale of its consumer services;

(l)  Whether Plaintiffs and the Putative Class subscribed to LifeLock and sustained damages as a result of LifeLock's false and misleading advertisements;

(m)  Whether the class-action prohibition provision in the LifeLock "Terms & Conditions" is unconscionable and unenforceable; and

(n)  Whether Plaintiffs and the Putative Class are entitled to recover compensatory, exemplary, treble, statutory or punitive damages based on the Defendants' fraudulent and illegal conduct or practices.

98.   **Typicality**: Plaintiffs are members of the Putative Class. Plaintiffs' claims have a common origin and share common bases. Their claims originate from the same illegal and fraudulent practices of the Defendants, and the Defendants act in the same way toward the Plaintiffs and the Class members. If brought and prosecuted individually, the claims of each Putative Class member would necessarily require proof of the same material and substantive facts, rely upon the same remedial theories, and seek the same relief.

99.   **Adequacy**: Plaintiffs are adequate representatives of the Putative Class because their interests do not conflict with the interests of the members of the Putative Class they seek to represent. Plaintiffs have retained competent counsel, and intend to prosecute this action vigorously. Plaintiffs' counsel will fairly and adequately protect the interests of the members of the Putative Class.

100. This lawsuit may be maintained as a class action pursuant to Maryland Rule §2-231 because Plaintiffs and the Putative Class seek declaratory and injunctive relief, and all of the above factors of numerosity, common questions of fact and law, typicality and adequacy are present. Moreover, Defendants have acted on grounds generally applicable to Plaintiffs and the Putative Class as a whole, thereby making declaratory and/or injunctive relief proper and suitable remedies.

101. This lawsuit may be maintained as a class action under Maryland Rule §2-231 because questions of fact and law common to the Class predominate over the questions affecting only individual members of the Class, and a class action is superior to other available means for the fair and efficient adjudication of this dispute. The damages suffered by each individual class member may be disproportionate to the burden and expense of individual prosecution of complex and extensive litigation to proscribe Defendants' conduct and practices. Additionally, effective redress for each and every class member against Defendants may be limited or even impossible where serial, duplicate, or concurrent litigation occurs arising from these disputes. Even if individual class members could afford or justify the prosecution of their separate claims, such an approach would compound judicial inefficiencies, and could lead to incongruous and conflicting judgments against Defendants.

## COUNT I
## MARYLAND CONSUMER PROTECTION ACT
### Md. COMMERCIAL LAW Code Ann. § 13-301 et seq.

102. Plaintiffs repeat and reallege each of the foregoing paragraphs of this Complaint as if set forth in full.

103. Plaintiffs and the Putative Class members are "persons" as contemplated by the Maryland Consumer Protection Act ("MCPA").

104.    LifeLock's deceptive marketing and advertising campaign are "advertisements" as contemplated by the MCPA.

105.    LifeLock's services are "merchandise" as contemplated by the MCPA.

106.    As alleged with specificity herein, Defendants engaged in deceptive and unfair trade practices in their relationship with Plaintiffs and the Putative Class.

107.    As alleged with specificity herein, Defendants, through their deceptive marketing and advertising campaign, have engaged in unfair and deceptive trade practices in connection with the offer for sale of LifeLock's identity theft protection services and purported service guarantee.

108.    As alleged with specificity herein, Defendants engaged in the concealment, suppression and omission of material facts, with the intent that Plaintiffs and the Putative Class would rely upon such concealment, suppression or omission, regarding LifeLock's identity theft protection services and purported service guarantee.

109.    As alleged with specificity herein, LifeLock's advertisements include false or misleading oral or written statements, visual descriptions, or other representations of any kind which have the capacity, tendency or effect of deceiving or misleading consumers.

110.    As alleged with specificity herein, LifeLock's advertisements include representations regarding its services, of a use, benefit, or quantity which its services do not have.

111.    As alleged with specificity herein, LifeLock advertises that its services are of a particular standard, quality, grade, style, or model which they are not.

112.    As alleged with specificity herein, LifeLock's advertisements fail to state a material fact, and such failure deceives or tends to deceive consumers.

113. As alleged with specificity herein, LifeLock advertises or offers consumer services without intent to provide those services as advertised or offered.

114. As alleged with specificity herein, LifeLock's advertisements employ deception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection with the sale of its consumer services.

115. Plaintiffs and the Putative Class subscribed to LifeLock based on its fraudulent and misleading advertising and marketing campaign, resulting in damages in an amount to be determined at trial.

116. Defendant Davis, along with others known and unknown, caused LifeLock to engage in these deceptive acts and practices.

117. Davis participated in the deceptive practices alleged in this Complaint by overseeing, directing and otherwise ratifying the action of the corporation he controls, to obtain personal financial benefits.

118. Davis has further participated in the complained of fraud by personally appearing in LifeLock's commercials and personally perpetrating the complained of misrepresentations and omissions.

119. As a result of Defendants' misrepresentations, false statements, and omissions, LifeLock's members, including the Plaintiffs and the Putative Class enrolled with LifeLock and paid LifeLock's fees.

120. LifeLock's members, including the Plaintiffs and the Putative Class, were injured by LifeLock's misrepresentations and omissions, and sustained damages in an amount to be proven at trial.

121.   Plaintiffs' and the Putative Class's damages are: (i) the monthly and/or annual charges paid for services and a service guarantee, neither of which are as effective as advertised, (ii) paying for a service that is illegal for a company such as LifeLock to perform, and (iii) having their creditworthiness or credit adversely affected because of Defendants' services.

## COUNT II
## DECLARATORY JUDGMENT

122.   Plaintiffs repeat and reallege each of the foregoing paragraphs of this Complaint as if set forth in full.

123.   An actual and justiciable controversy exists between Defendants and Plaintiffs concerning the parties' respective rights and obligations under the "Terms and Conditions" and whether the class action prohibition within the arbitration provision of those "Terms and Conditions" is unconscionable.

124.   The inclusion of such an onerous provision in the adhesive form "Terms and Conditions" is violative of Maryland public policy and renders the "Terms and Conditions" void and unenforceable.

125.   Plaintiffs are therefore entitled to a declaration from this Honorable Court that the "Terms and Conditions" entered into by Plaintiffs, and others similarly situated, are void and unenforceable. Alternatively, Plaintiffs ask the Court to strike those provisions that are unenforceable.

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, seek the following relief:

(a)   An Order certifying the proposed Class herein and appointing Plaintiffs and the undersigned counsel of record to represent the Class;

(b)   An Order rescinding the LifeLock subscription of each and every Plaintiff and member of the Class based on Defendants' fraudulent inducement

23

thereof, or, alternatively, damages for said fraud;

(c)    An Order issuing a preliminary injunction enjoining Defendants and all others, known and unknown, from continuing to take illegal action as set forth in this Complaint;

(d)    An Order issuing a permanent injunction enjoining Defendants and all others, known and unknown, from continuing to take illegal action as set forth in this Complaint;

(e)    An Order declaring the "Terms and Conditions" entered into by each and every Plaintiff and member of the Class unconscionable, and, therefore, unenforceable; or, in the alternative,

(f)    An Order severing the portions of the "Terms and Conditions" which the Court deems unconscionable and unenforceable, and enforcing the remaining valid portions of the "Terms and Conditions".

(g)    A Judgment awarding Plaintiffs and the Class compensatory, consequential, and statutory damages, including, without limitation, the loss of monies paid to LifeLock for its services, pre-judgment interest and post-judgment interest;

(h)    A Judgment awarding Plaintiffs and the Class exemplary and punitive damages;

(i)    A Judgment awarding Plaintiffs and the Class reasonable attorneys fees and costs of this action; and

(j)    Such other and further relief as this Honorable Court finds just and proper under the circumstances.

Respectfully Submitted,

HECHT & ASSOCIATES                          MARKS & KLEIN, LLP

Spencer M. Hecht                            David Paris
801 Wayne Avenue                            Justin Klein
Suite 400                                   63 Riverside Avenue
Silver Spring, Maryland 20910               Red Bank, New Jersey 07701
P: (301) 587-2099                           P: (732) 747-7100
F: (301) 587-42044                          F: (732) 219-0625
Counsel for Plaintiff                       Counsel for Plaintiff (*admission pending*)

Date: April 17, 2008

## JURY DEMAND

Plaintiffs, by and through undersigned counsel, respectfully request a trial by jury on all issues so triable.

Spencer M. Hecht