UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
Northern Division

GERALD FALKE and MARLENE FALKE,
Individually and on behalf of all others
similarly situated,

Plaintiffs,

vs.

LIFELOCK, INC., RICHARD TODD DAVIS,
and JOHN DOES 1 through 10, Inclusive,

Defendants.

Civil Action No. 08-CV-1351 (RDB)

Case No. 21-C-08-30505 CN
Removed from the Circuit Court for
Washington County, Maryland

## DEFENDANTS' RESPONSE IN OPPOSITION
## TO PLAINTIFFS' MOTION TO REMAND

### PRELIMINARY STATEMENT

Defendants LifeLock, Inc. ("LifeLock") and Richard Todd Davis ("Davis") submit this brief, and the accompanying Declarations of Tom Nichols ("Nichols Decl.") and Peter A. Antonucci, Esq. ("Antonucci Decl."), in opposition to Plaintiffs' Motion to Remand. Plaintiffs' Motion should be denied because federal jurisdiction is proper on not one, but two, alternative grounds.

First, on its face, the claims in the Class Action Complaint ("Complaint") depend upon the resolution of a substantial and disputed federal question: whether, as Plaintiffs expressly allege, LifeLock's identify theft protection services violate the Fair Credit Reporting Act ("FCRA"). The FCRA violations alleged by Plaintiffs serve as one of the primary bases for their claim that LifeLock engaged in "deceptive and unfair trade practices" in violation of the Maryland Consumer Protection Act, Md. Commercial Law Code Ann. §13-301, *et seq.* ("MCPA"). (Complaint, ¶¶ 15, 18, 121). Congress enacted the FCRA to ensure that consumer

credit information is at all times confidential, accurate, relevant, and utilized properly.  *See* 15 U.S.C. § 1681(b).

In their Complaint, Plaintiffs allege that LifeLock somehow violated these duties in the course of providing its identity theft protection service to residents of the State of Maryland. Plainly, then, on the face of Plaintiffs' well-pleaded complaint, a substantial and disputed federal question is raised under the FCRA – indeed, that question is at the very heart of the Complaint. Given these allegations, Plaintiffs' attempt to "back peddle" – by asserting that the claimed violations of the FCRA are merely "factual background" – simply does not ring true.  (*See* Docket No. 24-1, Plaintiff's Memorandum of Law ("Pl. MOL") at 5).  Nor does it diminish the fact that, on the face of Plaintiffs' own pleading, such claims serve as a central basis for the relief they seek.

Second, Plaintiffs concede that the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. §1332(d), will confer jurisdiction if the amount in controversy exceeds the sum of $5 million, exclusive of interests and costs.  (Pl. MOL at 13).  As set forth below, under any standard of proof, when viewed from LifeLock's standpoint, the $5 million threshold requirement is easily satisfied.  Indeed, as shown below, there is some **$46 million** at stake in this lawsuit.

**STATEMENT OF RELEVANT FACTS**

**I.**   **Plaintiffs' Claims Are National in Scope and Require Resolution in Federal Court.**

**A.**   **LifeLock's Services.**

Identity theft is a serious crime and its incidence is on the rise.  LifeLock's services are designed to protect its members from this crime.  LifeLock is an industry leader in the provision of identity theft protection services.  (*See* http://www.lifelock.com/about-us, attached as **Exhibit 1** hereto).  LifeLock's services include: (i) facilitating the requests for free fraud alerts

2

on behalf of its members; (ii) requesting that its members' names be removed from pre-approved credit card and junk mail lists; (iii) requesting, on behalf of its members, their free credit report from the major credit bureaus; (iv)assisting in the replacement of lost card(s), in the event a member's wallet and/or other documents are lost or stolen; and (v) if a member's identity is stolen while they are a LifeLock member, LifeLock will engage third parties to assist in restoring any such loss or recovery of expenses as required.   (*See* http://www.lifelock.com/1107, attached as **Exhibit 2** hereto).

With respect to (i) through (v) above, LifeLock expressly notifies the member that they could conduct these activities on their own at no charge.   *Id.*   With respect to (vi) above, LifeLock expressly represents its "$1 Million Service Guarantee" to the member, stating "[i]f your Identity is misused while you are a member of LifeLock, we'll spend up to $1,000,000 to make it right."   *Id.*

### B.   Plaintiffs' Allegations Are Premised Upon a Violation of Federal Law.

Plaintiffs claim that "[t]he primary service that LifeLock provides to protect against identity theft is the placement and renewal of fraud alerts on subscribers' credit profiles." (Complaint, ¶ 52).   Plaintiffs allege, among other things, that LifeLock misrepresents the scope and effectiveness of its services because it allegedly "fails to disclose that the methods it employs in providing its purported protection are improper and violate the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.*" (Complaint, ¶ 18).   The Complaint further alleges that conduct governed exclusively by the FCRA, such as LifeLock's advertisements and marketing with respect to such fraud alerts, is also unlawful. (Complaint, ¶¶ 13, 15-16, 18, 52, 58-67, 101, 106-114, 121).

LifeLock's purported violation of the FCRA serves as the keystone for Plaintiffs' claim that LifeLock has engaged in "deceptive and unfair trade practices" under the MCPA.

(Complaint, ¶¶ 2, 107). Indeed, allegations of LifeLock's "deceptive business practices" – as measured against the alleged FCRA violations – are repeated as the foundation of Plaintiffs' claims under the MCPA. By incorporating a violation of the FCRA as a central element of their claims (as pleaded in the Complaint) Plaintiffs have expressly injected an issue that *requires* resolution of a substantial and disputed question of federal law – namely, whether LifeLock has violated the FCRA. (Complaint, ¶¶ 106-114, 121).

C.   **Plaintiffs' Action, in Addition to Other Similar Cases, Implicate National Concerns Because They Are Premised Upon Allegations of Deceptive Business Practices With Respect to LifeLock's Nationwide Advertising.**

Not only do Plaintiffs expressly invoke a violation of the FCRA, but their counsel, in addition to others, have filed lawsuits in state and federal courts across the country. Each of these actions is premised upon the same basic theory as Plaintiffs' claims here – that Defendants have deceptively marketed LifeLock's services in their national advertising campaign in violation of the FCRA. At present, the following actions have been filed against LifeLock and/or Davis, all of which contain foundational allegations that (i) LifeLock's national advertising campaign is deceptive and misleading; and/or (ii) LifeLock has violated the FCRA:

- *Byrl Lane v. LifeLock, Inc.*, United States District Court for the District of Arizona, Civil Action No. CV-08-594 ("*Lane*");

- *Jason Sbalcio v. LifeLock, Inc.*, United States District Court for the District of New Jersey, Civil Action No. CV-08-2799 ("*Sbalcio*");[1] and

- *James and Susan Kondrat v. LifeLock, Inc.*, United States District Court for the District of Northern Illinois, Civil Action No. 08-CV-3244-JH ("*Kondrat*").

---

[1]   *Lane* and *Sbalcio* go through in detail the alleged violations of the FCRA, and claim that "Defendant's actions have injured thousands of individuals across the country by unlawfully inducing them to enter into contracts that violate federal law and do not provide the promised protections." (*See Lane* Complaint, Antonucci Decl., Exh. A, ¶¶ 1; 75-79; *Sbalcio* Complaint, Antonucci Decl., Exh. B, ¶ 1).

4

Similarly, the following matters contain allegations identical to this case:

- *Kevin Gerhold v. LifeLock, Inc. and Richard Todd Davis*, filed in West Virginia state court and removed to the United States District Court for the Southern District of West Virginia, Civil Action No. 2:08-0857 ("*Gerhold*"),

- *Vilma Martinez-Azoy v. LifeLock, Inc. and Richard Todd Davis*, filed in Florida state court and removed to the United States District Court for the Southern District of Florida, Civil Action No. 08-21989-CIV-MOORE-SIMONTON ("*Martinez-Azoy*");

- *Warren Pasternack v. LifeLock, Inc. and Richard Todd Davis*, filed in New Jersey state court and removed to the United States District Court for the District of New Jersey, Civil Action No. 08-cv-02098 (FLW)(JJH) ("*Pasternack*").

- *Robert Dillon v. LifeLock, Inc. and Richard Todd Davis*, filed in California state court and removed to the United States District Court for the Central District of California, Civil Action No. CV08-04515-SVW-AJWx ("*Dillon*"); and

- *Tommy Ly v. LifeLock, Inc. and Richard Todd Davis*, filed in the United States District Court for the Eastern District of Texas, Civil Action No. 08-CV-00242 ("*Ly*").[2]

---

[2]    Like Plaintiffs here, these actions allege that LifeLock induced consumers "across the country to subscribe to its services, [by claiming] that it will prevent any possibility of identity theft, in any form" (*See* Complaint, ¶ 3; *Gerhold Complaint*, Antonucci Decl., Exh. C, ¶3; *Martinez-Azoy* Complaint, Antonucci Decl., Exh. D, ¶ 3; *Pasternack* Complaint, Antonucci Decl., Exh. E, ¶ 3; *Dillon* Complaint, Antonucci Decl., Exh. F, ¶ 3; *Ly* Complaint, Antonucci Decl., Exh. H, ¶ 3) and "fails to disclose that the methods it employs in providing its purported protection … **violate the Fair Credit Reporting Act**." (*See* Complaint, ¶ 18; *Gerhold* Complaint, Antonucci Decl., Exh. C, ¶ 19; *Martinez-Azoy* Complaint, Antonucci Decl., Exh. D, ¶ 19; *Pasternack* Complaint, Antonucci Decl., Exh. E, ¶ 18; *Dillon* Complaint, Antonucci Decl., Exh. F ¶ 19; *Ly* Complaint, Antonucci Decl., Exh. H, ¶ 19) (emphasis added).

As in the present matter, all of the cases identified also attempt to establish either a violation of the FCRA and/or national misconduct as a basis for relief.  (*See Lane* Complaint, Antonucci Decl., Exh. A, ¶¶ 60-61; 75-79; *Kondrat* Complaint, Antonucci Decl., Exh. G, ¶¶ 2; 35-36; 41-43; *Sbalcio* Complaint, Antonucci Decl., Exh. B, ¶¶ 65-67; 78-79; 86; *Pasternack* Complaint, Antonucci Decl., Exh. E, ¶¶ 3; 15; 18; 106-109; *Gerhold* Complaint, Antonucci Decl., Exh. C, ¶¶ 15; 19; 117-118; *Martinez-Azoy* Complaint, Antonucci Decl., Exh. D, ¶¶ 3; 15; 19; 125; 134-135; *Dillon* Complaint, Antonucci Decl., Exh. F, ¶¶ 3; 15; 19; 141-145; 157-158).  Moreover, Plaintiffs' counsel has represented that additional similar cases are to be filed against LifeLock in the near future.

Except for *Sbalcio*, *Lane* and *Ly*, each of the cases pending in other jurisdictions are brought by Marks & Klein, LLP, counsel for Plaintiffs in this matter, who have obtained local counsel in each respective jurisdiction.  Notably, Marks & Klein has, on behalf of its clients, **consented to federal jurisdiction in Florida, Texas, New Jersey and California**.  Yet, inexplicably, that same firm, but on behalf of a different group of clients, is opposing federal jurisdiction here, even though Plaintiffs' Complaint contains virtually the same allegations made in Florida, Texas, New Jersey and California.  There is simply no reasonable explanation for Plaintiffs' refusal to concede that this case – like the others – should be heard in federal court.

**D.    LifeLock Has Filed a Motion for Transfer and Consolidation Pursuant To 28 U.S.C. § 1407.**

Because this case, and those discussed above, each present nearly identical allegations and will require resolution of parallel issues, including whether LifeLock violated the FCRA through deceptive business practices in connection with its advertising of identity theft services, LifeLock filed a Motion for Transfer and Consolidation under 28 U.S.C. § 1407 on or about June 18, 2008, Docket No: MDL No. 1977 – *In re LifeLock, Inc., Marketing and Sales Practices Litigation*, to transfer all of the actions to the District Court for the District of Arizona for consolidation as a Multidistrict Litigation ("MDL").[3] (Antonucci Decl., ¶ 4)  Consolidation of the above-referenced actions will ensure that the parties are not subjected to inconsistent or conflicting pretrial rulings regarding material issues, such as varying interpretations of the FCRA.  At present, LifeLock bears the very substantial risk that courts in Arizona, Illinois, New Jersey, Maryland, West Virginia, Texas, Florida and California may rule very differently on these issues.  (Antonucci Decl., ¶ 5).

---

[3]    The *Martinez-Azoy*, *Ly*, *Dillon* and *Gerhold* actions were not included in LifeLock's original MDL application.  However, LifeLock intends to file a supplemental schedule of actions with the Joint Panel on Multidistrict Litigation.

II.     **The Relief Plaintiffs Seek**.

    A.     **Plaintiffs' Claimed Damages and Other Relief Sought**.

At a minimum, Plaintiffs seek (i) return of the monies paid to LifeLock and/or rescission of their subscriptions; (ii) temporary and permanent restraints on LifeLock's ability to sell its service to Maryland consumers or to conduct any advertising and/or marketing of its services in Maryland; (iii) money damages, including but not limited to statutory damages, punitive/exemplary damages and consequential damages; and (iv) attorneys' fees (Complaint, pgs. 23-24).

    B.     **LifeLock's Maryland Members**.

        1.     **LifeLock's Historical Maryland Revenues**

Plaintiffs identify their proposed class, those seeking return of their subscriptions, as "[a]ll residents of the state of Maryland . . . that subscribed to LifeLock during the longest period permitted by the applicable statute of limitations." (Complaint, ¶ 95).  From 2005 to the present, LifeLock has received the following annual revenues from its members located in Maryland:

| Year | Sales Revenue |
|---|---|
| 2005 | $425 |
| 2006 | $30,685 |
| 2007 | $593,980 |
| 2008 (as of 4/22/2008)[4] | $1,381,590 |
| Total | $2,006,680 |

(Nichols Decl., ¶ 4)   Therefore, on its face, the Complaint identifies LifeLock sales revenue of $2,006,680 that Plaintiffs seek returned to the putative class members.  (*Id.*).

---

[4] April 22, 2008 is the date on which the Complaint in this action was filed.

2.     **LifeLock's Projected Lost Maryland Revenues from Its Existing Maryland Members.**

LifeLock currently maintains a 95% annual member retention rate, with an average Annual Selling Price ("ASP") for each LifeLock member of $90 per member. (*Id.*, ¶ 7). As of the date of the filing of the Complaint, LifeLock had 16,254 Maryland members. If Plaintiffs are successful in this case, LifeLock will be precluded from offering, continuing or selling its service to any Maryland consumer. Thus, assuming a retention rate of 90% and an average Selling Price ("ASP") of $85 per member, LifeLock is faced in this action with the projected lost revenues, over the next five years from only its **existing** Maryland member base, of approximately $5.6 million, as follows:

| Year | Active MD Members - Net | Average Annual Selling Price | Projected Sales Revenue |
|---|---|---|---|
| 1 | 16,254 | $85.00 | $1,381,590 |
| 2 | 14,629 | $85.00 | $1,243,431 |
| 3 | 13,166 | $85.00 | $1,119,088 |
| 4 | 11,849 | $85.00 | $1,007,179 |
| 5 | 10,664 | $85.00 | $ 906,461 |
| Total: | – | – | $5,657,749 |

(*Id.*, ¶ 8).

///

///

3.     **LifeLock's Projected Lost Maryland Revenues from Projected New Members.**

LifeLock has experienced substantial growth over the last three years and, in addition to its existing Maryland member base, LifeLock has projected revenues in excess of $40 million from new Maryland members over the next five years, as follows:

| Year | Projected MD Members - Net | Average Annual Selling Price | Projected Sales Revenue |
|------|------|------|------|
| 1 | 24,000 | $85.00 | $2,040,000 |
| 2 | 56,000 | $85.00 | $4,760,000 |
| 3 | 97,000 | $85.00 | $8,245,000 |
| 4 | 135,000 | $85.00 | $11,475,000 |
| 5 | 168,000 | $85.00 | $14,280,000 |
| Total: | – | – | $40,800,000 |

(*Id.*, ¶ 9).   Based upon the foregoing, LifeLock anticipates an additional 168,000 Maryland members within the next five years, generating sales revenue of approximately $40 million over that five-year period.   Thus, if Plaintiffs are successful, LifeLock's total projected revenue (between its existing members and projected new members) is $46 million, all of which is potentially at stake in this action.  (*Id.*, ¶ 11).

///

///

## LEGAL ARGUMENT

I.  **Federal Jurisdiction Is Proper Pursuant to 28 U.S.C. § 1331 Because Plaintiffs' Claims Depend Upon the Resolution of a Substantial and Disputed Federal Question.**

Section 1331 of 28 U.S.C. provides that "[t]he district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws or treaties of the United States." 28 U.S.C. § 1331. For more than one hundred years, the United States Supreme Court has recognized that this jurisdictional statement includes state law claims that implicate significant federal issues. *See Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 312 (2005). This longstanding doctrine is in accord with "the commonsense notion that a federal court ought to be able to hear claims recognized under state law that nonetheless turn on substantial questions of federal law, and thus justify resort to the experience, solicitude, and hope of uniformity that a federal forum offers on federal issues." *Id.*

A.  **Plaintiffs' Complaint Raises an Actual and Disputed Substantial Federal Issue That Invokes Federal Jurisdiction.**

The issue in this case is precisely the issue presented in *Grable*: "does a state-law claim necessarily raise a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities." *Grable*, 545 U.S. at 314. When the answer to this question is in the affirmative, federal jurisdiction is warranted. Where, as here, Plaintiffs expressly claim LifeLock's alleged violation of the FCRA, their state law claims substantially implicate a significant federal issue. It is beyond reasonable argument that the Complaint states a violation of the FCRA as a central basis for Plaintiffs' claims.

Although Plaintiffs purport to raise only state law claims (Pl. MOL, at 5-6),[5] such claims are necessarily federal in character by virtue of their clear intent to rely upon an alleged violation of the FCRA. Accordingly, "a plaintiff may not defeat removal by omitting to plead necessary federal questions in a complaint." *Franchise Tax Bd. of State of Cal. v. Const. Laborers Vacation Trust for Southern California*, 463 U.S. 1, 22 (1983). Therefore, it is the **actual nature** of a plaintiff's claim that supports, or precludes, the exercise of federal jurisdiction – not the label the plaintiff attaches to it. *Id.* In this case, no matter how Plaintiffs wish to characterize their claims, the actual nature of the action, **as expressly pleaded in the Complaint**, hinges upon a determination of whether LifeLock violated the FCRA.

**B.      Plaintiffs' Invocation of a Violation of the FCRA Federalizes Their Claims and Subjects Them to Federal Jurisdiction.**

The United States Supreme Court has repeatedly held that a case properly invokes federal question jurisdiction "where the vindication of a right under state law necessarily turned on some construction of federal law." *Franchise Tax Bd.*, 463 U.S. at 9 (citing *Smith v. Kansas City Title & Trust Co.*, 255 U.S. 180 (1921); *Hopkins v. Walker*, 244 U.S. 486 (1917)). As noted in *Franchise Tax Board*, "[l]eading commentators have suggested that for purposes of § 1331 an action 'arises under' federal law 'if in order for the plaintiff to secure the relief sought he will be obliged to establish both the correctness and the applicability to his case of a proposition of federal law.'" 463 U.S. at 9 (citing P. Bator, *et al.*, HART & WECHSLER'S THE FEDERAL COURTS

---

[5]      Realizing that their own Complaint serves to establish the existence of a federal question, Plaintiffs disingenuously state that they were merely "briefly mentioning" a violation of the FCRA, and that it simply serves as "factual background" to the Complaint. (Pl. MOL, at 5). However, Plaintiffs directly plead a violation of the FCRA (Complaint, ¶ 18). Plaintiffs nonetheless state that their Complaint does not **"allege, or even contemplate, relief created by federal law."** (Pl. MOL at 6, emphasis added). However, by pleading violations of the FCRA as a prerequisite, Plaintiffs want to have their cake and eat it too by having a state court resolve this substantial and disputed federal issue.

AND THE FEDERAL SYSTEM 889 (2d ed. 1973) (noting that "a case may 'arise under' a law of the United States if the complaint discloses a need for determining the meaning or application of such a law.")).

Plaintiffs' attempt to distinguish *Grable* through the mental gymnastics of asserting that: (i) although they **plead a violation of a federal statute and incorporate that alleged violation into their claims,** (ii) none of their claims depend on an interpretation of federal law.  In *Grable*, as here, the issue in dispute was whether there was a violation of a federal statute that impacted plaintiff's state law claim.  *Grable*, 545 U.S. at 314-315.  As set forth at length above in the Statement of Relevant Facts, Plaintiffs specifically allege, as a predicate for their claims, that LifeLock "fails to disclose that the methods it employs in providing its purported protection are improper and violate the Fair Credit Reporting Act, 15 U.S.C. §1681, et seq." (Complaint, ¶ 18). Accordingly, Plaintiffs' claims each require an analysis and determination of whether LifeLock violated the FCRA – and *Grable* has direct application for federal jurisdiction.

The Fourth Circuit has not yet had an opportunity to apply *Grable*.  But the Second Circuit, in *Broder v. Cablevision Sys. Corp.*, 418 F.3d 187 (2d Cir. 2005), decided after *Grable*, considered a case similar to this one, and the Court's holding is instructive here.  In *Broder*, the plaintiff filed a class action complaint in New York state court, alleging, *inter alia*: (i) breach of contract, premised in part on a violation of federal law; and (ii) a violation of New York's General Business Law § 349 ("§ 349") in failing to provide uniform rates and/or notice of such rates as required by federal and state law, and that such failure constituted "materially deceptive acts or practices" under the state statute.  *Id.* at 192-193.[6]  Defendant Cablevision removed the

---

[6]     Additionally, Plaintiff Broder sought an injunction premised in part upon Defendants' alleged violation of federal law.  *Broder*, 418 F.3d at 193.

action to federal court and Plaintiff moved to remand for lack of subject matter jurisdiction. *Id.*

Plaintiff's remand motion was denied and Plaintiff appealed.[7]

The *Broder* Court analyzed whether the Complaint raised a disputed and substantial

federal issue under the *Grable* federal question jurisdictional analysis:[8]

> To answer this question, we must ascertain which portions of Broder's complaint
> comprise distinct "claims." **A single claim over which federal-question
> jurisdiction exists is sufficient to allow removal.** Where a federal issue is
> present as only one of multiple theories that could support a particular claim,
> however, this is insufficient to create federal jurisdiction. **But what a plaintiff
> presents as one "count" may be understood to encompass more than one
> "claim."**

*Broder*, 418 F.3d at 194 (emphasis added).  The Second Circuit concluded that the consumer-

fraud "count" of Broder's Complaint actually comprised two distinct "claims": (1) a claim that

Cablevision violated 47 U.S.C. § 543(d) and thereby violated the consumer-fraud statute, and (2)

a claim that Cablevision violated the state statute, § 349.  *Id.* at 194-95.  Accordingly, the court

held Broder's complaint made a "distinct claim" under 47 U.S.C. § 543(d) and concluded that

this federal issue was both substantial and disputed.  Thus, the Second Circuit affirmed the

district court's determination of federal question jurisdiction and the denial of Broder's motion to

remand.  *Id.* at 195-96.  This is precisely the situation here, where Plaintiffs' claims should be

viewed for what they are: (1) a claim that LifeLock violated the FCRA, and therefore violated

the MCPA (or committed some other predicate act), and (2) a claim that LifeLock violated and is

responsible for damages under the asserted state law claims.

---

[7]     After the district court denied Plaintiff's remand motion, Plaintiff sought to certify the
denial for interlocutory appeal and Cablevision moved to dismiss.  The district court granted
Cablevision's motion to dismiss and denied Plaintiff's motion for certification as moot.  *Broder*,
418 F.3d at 193.

C.    *Grable* and *Broder* Require Federal Jurisdiction in This Case.

Based upon the foregoing, where Plaintiffs allege a violation of a federal statute (the FCRA) as a separate and distinct violation of a state consumer-fraud statute (the MCPA), this Court should exercise jurisdiction.  Although Plaintiffs maintain that their Complaint does not "allege, or even contemplate, relief created by federal law." (Pl. MOL at 6), the Complaint itself belies such an assertion, frequently referencing the FCRA, and expressly claiming that "LifeLock fail[ed] to disclose that the methods it employs in providing its purported protection are improper **and violate the Fair Credit Reporting Act**, 15 U.S.C. § 1681, *et seq*." (Complaint ¶ 18, emphasis added).[9]

Although Plaintiffs have deliberately drafted the Complaint in an attempt to evade the jurisdiction of this Court, they cannot escape federal question jurisdiction because the complained of conduct necessarily requires a determination of whether LifeLock violated the FCRA.  It is patently obvious that Plaintiffs rely on alleged violations of the FCRA not only to show that LifeLock failed to disclose the scope and effectiveness of its services, but also that LifeLock's alleged violations of the FCRA are, in and of themselves, "deceptive acts and practices" within the meaning of the MCPA.

For example, in the First Count of the Complaint, Plaintiffs allege that, "**[a]s alleged with specificity [in this Complaint],** defendants engaged in deceptive acts and unfair trade practices in their relationship with Plaintiffs and the Putative Class."  (Complaint, ¶ 106,

---

[9]    The Complaint contains numerous other allegations that implicate the FCRA.  For example: (i) paragraphs 63-67 allege that LifeLock's services can negatively impact the subscriber's credit score; (ii) paragraphs 68-71 allege that LifeLock fails to disclose the "true origin" of the free credit report it obtains for its customers and expressly incorporate the FCRA (Complaint, pg. 13).

emphasis added).[10]  Plaintiffs specifically allege a violation of the FCRA, as well as numerous

other references to conduct that can only be reasonably read to refer to the FCRA, in advance of

this claim.  (Complaint, ¶¶ 15, 18, 63-71; *see also* Complaint ¶ 121).  Plainly, Plaintiffs intend to

prove that Lifelock violated federal law.  Because these alleged violations form a distinct basis

for their MCPA claim, they have raised a substantial and disputed issue of federal law, just as the

plaintiff did in *Broder*.  Accordingly, federal jurisdiction is appropriate pursuant to 28 U.S.C.

§ 1331.

D.    **The Authorities Cited by the Plaintiffs Do Not Apply the Standards Announced in *Grable*.**

In the section of their brief dealing with federal-question jurisdiction, Plaintiffs cite a

large number of Fourth Circuit cases, apparently to give the impression that their position is well

supported under controlling law.  But the reality is, the Fourth Circuit has never cited *Grable* in a

reported opinion, and therefore has never applied the standards announced in that decision.  This

is problematic because *Grable* represents the Court's most recent, and most definitive, statement

on federal-question jurisdiction.  *See Kuntz v. Illinois Central R. Co.*, 469 F. Supp.2d 586, 596

(S.D. Ill. 2007) (calling *Grable* "[t]he Supreme Court's most important recent pronouncement on

the substantial federal question doctrine").  As a result, the cases cited by Plaintiffs cannot be

considered instructive here.  And, in fact, the vast majority of them are completely inapposite.

For instance, *Maryland Stadium Auth. v. Ellerbe Becket, Inc.*, 407 F.3d 255 (4th Cir.

2005); *Strudnick v. Whitney*, 2008 U.S. Dist. LEXIS 41811 (D. Md. 2008); and *County Comm'rs*

---

10    The allegations to which Plaintiffs refer necessarily include paragraphs 15, 18, 63-71, and 121 of the Complaint, all of which deal with the manner in which LifeLock's services purportedly impacted Plaintiffs' creditworthiness, or otherwise violated protections afforded under the FCRA.  Simply stated, Plaintiffs do not, and cannot, offer any other reasonable interpretation of the Complaint that does not directly allege and rely upon a claimed violation of the FCRA.

*v. Tingle*, 2008 U.S. Dist. LEXIS 41822 (D. Md. 2008), were all cases in which diversity jurisdiction, not federal question, was the purported basis for removal. *Lontz v. Tharp*, 413 F.3d 435 (4th Cir. 2005); *Harless v. CSX Hotels, Inc.*, 389 F.3d 444 (4th Cir. 2004); and *King v. Marriott Int'l, Inc.*, 337 F.3d 421 (4th Cir. 2003), were all cases in which the defendant argued that the plaintiffs' claims were completely preempted.[11]  In *Cook v. Georgetown Steel Corp.*, 770 F.2d 1272 (4th Cir. 1985), "[a] federal issue [was] interjected into the cases only by defendant's counterclaim or setoff," which the court held was in sufficient to invoke federal jurisdiction. *Id.* at 1275.[12]  *Mulcahey v. Columbia Organic Chem. Co.*, 29 F.3d 148 (4th Cir. 1994); and *Dixon v. Coburg Dairy, Inc.*, 369 F.3d 811 (4th Cir. 2004), both relied on the Supreme Court's decision in *Merrell Dow*,[13] and held that a private right of action under federal law – not merely the presence of a substantial federal issue – was a prerequisite to a finding of federal-question jurisdiction. *Grable* held that a federal cause of action is *not* a condition for exercising federal-question jurisdiction. *See Grable*, 545 U.S. at 311-12.  Accordingly, the viability of *Mulcahey* and *Dixon* post-*Grable* is questionable.

In other cases cited by Plaintiffs, the courts concluded that federal jurisdiction was **proper**, although for reasons that have no relevance to this case. *E.g.*, *Rosenfield v. Wilkins*, 2008 U.S. App. LEXIS 11329 (4th Cir. 2008) ("[T]he district court had jurisdiction over Rosenfield's Fifth Amendment claims [challenging his compensation as a court-appointed

---

[11] Under the "complete preemption" doctrine, an action can be removed to federal court because, "in some cases, federal law so completely sweeps away state law that any action purportedly brought under state law is transformed into a federal action that can be brought originally in, or removed to, federal court." *King*, 337 F.3d at 425 (citing *Metropolitan Life Ins. Co. v. Taylor*, 481 U.S. 58, 63 (1987)).

[12] *Cook*'s holding was based on the well-established principle that "a defendant may not defend his way into federal court because a federal defense does not create a federal question under § 1331." *In re Blackwater Security Consulting, LLC*, 460 F.3d 576, 584 (4th Cir. 2006).

[13] *Merrell Dow Pharms., Inc. v. Thompson*, 478 U.S. 804 (1986).

attorney] pursuant to 28 U.S.C. § 1331 . . . ."); *Discover Bank v. Vaden*, 489 F.3d 594 (4th Cir. 2007) (district court properly exercised jurisdiction over an action to compel arbitration based on the preemptive effect of federal banking laws); *Rosciszewski v. Arete Assocs., Inc.*, 1 F.3d 225 (4th Cir. 1993) (removal was appropriate because the plaintiff's claim was preempted by the Copyright Act).

Thus, the cases cited by Plaintiffs have little bearing on the issues presented in this case. Defendants respectfully submit that, in the absence of controlling Fourth Circuit authority on this issue, the Court should follow the Second Circuit's well-reasoned decision in *Broder*.

## II.    Federal Jurisdiction Is Proper Under 28 U.S.C. § 1332 Because Defendants Satisfy the Requirements of the Class Action Fairness Act ("CAFA").

Federal jurisdiction is also proper because Defendants satisfy the requirements of CAFA. Pursuant to CAFA, federal courts have jurisdiction over class actions in which: (1) the class consists of 100 or more members (*see* 28 U.S.C. § 1332(d)(5); (2) any member of the class is a citizen of a State different from any defendant (*see* 28 U.S.C. § 1332(d)(2)); and (3) the amount in controversy, after aggregating the class members' claims, exceeds the sum or value of $5 million, exclusive of interest and costs (*see* 28 U.S.C. § 1332(d)(2) and (6)).  Plaintiffs concede that the first two prerequisites of CAFA are satisfied.  (*See* Pl. MOL at 16).  Thus, the only disputed issue is whether the amount in controversy exceeds the sum or value of $5 million.  As detailed below, the $5 million jurisdictional amount is readily satisfied here, warranting this Court's exercise of jurisdiction.

A.    **The Controlling Legal Standard for Determining the Amount in Controversy Under CAFA.**

Where Plaintiffs have not specifically alleged an amount of damages in the Complaint, the amount in controversy must be proven by a "preponderance of the evidence." *See McNutt v. General Motors Acceptance Corp.*, 298 U.S. 178, 189 (1936); *Strawn v. AT&T Mobility LLC*, No. 07-2084, 2008 WL 2575871, at *5 (4th Cir. Jun. 30, 2008).

Here, Plaintiffs' Complaint does not state an exact damage amount.  Rather, Plaintiffs state that the class consists of more than 1,000 members, and that the "general subscription fee" is $110 per year.  (Pl. MOL at pg. 15).  In addition, they generally aver an entitlement to two separate and parallel forms of relief: (1) monetary damages in the form of the return of their subscription fees and/or rescission of their subscriptions, in addition to statutory damages, punitive/exemplary damages and/or consequential damages, and attorneys' fees; and (2) injunctive relief in the form of temporary and permanent restraints on LifeLock's ability to continue to offer, sell, advertise or market its services in Maryland.  (Complaint, pgs. 23-24).  Such a result would cause LifeLock to forfeit over $46 million in lost revenue.  Thus, Defendants have easily satisfied the $5 million threshold and have proved it by preponderance of the evidence.

B.    **Determining the Amount in Controversy Under CAFA.**

There is a paucity of authority addressing the manner in which a Court should evaluate the amount in controversy under CAFA (*e.g.*, from plaintiff's viewpoint or defendant's viewpoint) since CAFA was enacted in 2005.  However, the post-CAFA cases, as well as the Senate Judiciary Committee's Report, yield but one conclusion: regardless of the type of relief sought, the amount in controversy under CAFA may be determined from either a plaintiff's or defendant's viewpoint.

The Senate Judiciary Committee (the "Committee") has clearly articulated the

Congressional intention that the $5 million jurisdictional amount may be arrived at from either a

defendant's or plaintiff's viewpoint, stating:

> . . . the Committee intends that a matter be subject to federal jurisdiction under this provision if the value of the matter in litigation exceeds $5,000,000 **either from the viewpoint of the plaintiff or the viewpoint of the defendant, and regardless of the type of relief sought (e.g., damages, injunctive relief, or declaratory relief).**

*See* S. Rep. No. 109-14, at 42 (emphasis added).  Clearly recognizing the pre-CAFA rule as set

forth in footnote 20 below, the Committee clarified:

> The Committee is aware that some courts, especially in the class action context, have declined to exercise federal jurisdiction over cases on the ground that the amount in controversy in those cases exceeded the jurisdictional threshold only when assessed from the viewpoint of the defendant.  For example, a class action seeking an injunction that would require a defendant to restructure its business in some fundamental way might "cost" a defendant well in excess of $75,000 under current law, but might have substantially less "value" to a class of plaintiffs. Some courts have held that jurisdiction does not exist in this scenario under present law, because they have reasoned that assessing the amount in controversy from the defendant's perspective was tantamount to aggregating damages. Because S.5 [bill number] explicitly allows aggregation for purposes of determining the amount in controversy in class actions, that concern is no longer relevant … Overall, new section 1332(d) is intended to expand substantially federal court jurisdiction over class actions [and] . . . should be read broadly . . .

*See* S. Rep. No. 109-14, at 42-43.

Although it does not appear that this precise issue has been considered by the Fourth

Circuit or this Court, the cases that have unanimously recognize that, under CAFA, the value of

the amount in controversy may be determined either from the viewpoint of the plaintiff or the

viewpoint of the defendant, regardless of the type of relief sought. *See Toller v. Sagamore Ins.*

*Co.*, No. 2:07CV00062 JLH, 2008 WL 927703, at *5 (April 4, 2008, E.D. Ark.) (recognizing

that the Eighth Circuit's traditional plaintiff's viewpoint rule was inconsistent with CAFA and

that "'the proper approach to valuing claims for injunctive relief under CAFA seems to be to use

the total benefit to the plaintiff class or the aggregate cost to the defendant.'" (quoting Sarah S.

Vance, "A Primer on the Class Action Fairness Act of 2005," 80 TUL. L. REV. 1617, 1628-29

(2006)); *Berry v. Am. Express Publ'g Corp.*, 381 F. Supp.2d 1118, 1123 (C.D. Cal. 2005)

(recognizing that the justification for the Ninth Circuits prior "plaintiff viewpoint" rule, given the

explicit statutory change allowing aggregation of claims in class actions" was no longer relevant

and concluding "that the amount in controversy may be satisfied either from the view of the

aggregate value to the class members or defendants."); *Yeroushalmi v. Blockbuster, Inc.*, No. CV

05-225-AHM(RCX), 2005 WL 2083008, at *3, n. 4 (July 11, 2005, C.D. Cal.) (CAFA overrules

the Ninth Circuit's prior rejection of the "either viewpoint rule").   Therefore, in the post-CAFA

world, the amount in controversy can be calculated using the value of the damages sought by

plaintiff, in addition to, or in conjunction with, the value or cost **to the defendant** of any

injunctive relief sought.

      **C.**    **The $5 million Threshold of CAFA Is Met From Defendants' Viewpoint.**

      **1.**    **The Loss of LifeLock's Current Membership Base Annualized Over Five Years.**

The amount in controversy is easily satisfied when viewed from Defendants' viewpoint. LifeLock currently maintains a Maryland member base of 16,254 members and its projected revenues from this current membership base is approximately $5.6 million over the next five years.  Thus, the loss of these subscriptions alone satisfies the requisite $5 million amount-in-controversy requirement.

      **2.**    **The Loss of LifeLock's Prospective New Membership Base Over Five Years.**

In addition to seeking a refund of membership fees paid by current members, Plaintiffs seek temporary and permanent restraints on LifeLock's ability to advertise and/or market its

services in Maryland.   This will result in LifeLock's loss of **future** members and **future** revenues of approximately \$40 million.[14]

Based on the above figures, the amount in controversy, when viewed from LifeLock's standpoint, represents potential losses of some \$46 million – \$5.6 million in lost revenues from LifeLock's current subscriber base, and more than \$40 million in lost future revenues, if Plaintiffs are successful in blocking LifeLock from selling or advertising its services in Maryland.

### D.      In All Events, Plaintiffs Are Not Entitled to Costs on Remand.

While it is clear that this case should not be remanded, even if the Court orders a remand, Plaintiffs are not entitled to attorneys fees' or costs.  Plaintiffs base their claim for an award of fees and costs on their belief that "Defendants' claims of federal question jurisdiction [are] baseless and implausible [and that Defendants] have utterly failed to provide any statistical substantiation in support of their purported estimate of an amount in controversy in excess of \$5,000,000." (Pl. MOL, at 18, citing *Martin v. Franklin Capital Corp.*, 546 U.S. 132 (2005)). Plaintiffs' position is without merit.

As set forth at length above, Plaintiffs have embedded a substantial federal issue in the Complaint, one that serves as a predicate fact that they seek to establish in support of certain of their state law MCPA claim.  As such, there was plainly a good-faith basis for removal pursuant to 28 U.S.C. § 1331.  Defendants also had a good-faith basis to assert that the amount in

---

[14]     Even if this projection is overstated, one-half of the projection would yield an amount in controversy of some \$20 million; one-third would yield an amount in controversy of more than \$13 million; one-fourth would yield an amount in controversy of more than \$10 million; and one-fifth of the projection would yield an amount in controversy of about \$8 million.  Indeed, even one-tenth of the projection yields a potential amount in controversy in excess of the jurisdictional amount when combined with the other amounts at issue in this case (statutory damages, punitive damages, and attorneys' fees, plus projected lost revenues from LifeLock's existing customer base that totals almost \$6 million).

controversy was satisfied.  As demonstrated above, from LifeLock's perspective, the potential loss it could incur in this lawsuit exceeds the $5 million threshold many times over.  As a result, LifeLock's removal was reasonable, and Plaintiffs' request for fees and costs would have to be denied even if the motion to remand were granted.

## CONCLUSION

For all of the foregoing reasons, the Court should deny Plaintiffs' motion and retain jurisdiction over this case.

Dated: July 21, 2008                      Respectfully submitted,

                                          **LifeLock, Inc., and Robert Todd Davis**

                                          /s/ David S. Panzer

                                          Eric C. Rowe (Fed. Bar # 14816)
                                          David S. Panzer (Fed. Bar # 14860)
                                          Greenberg Traurig, LLP
                                          2101 L Street, NW
                                          Suite 1000
                                          Washington, DC  20037
                                          Tel. (202) 331-3100
                                          Fax. (202) 331-3101
                                          panzerd@gtlaw.com

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on July 21, 2008, I served the foregoing **Response in Opposition to Plaintiffs' Motion to Remand** by filing the same via ECF.

/s/ David S. Panzer
David S. Panzer

*PHX 328,312,149v2*